UNITED STATES of America,
Plaintiff,

v.

Timothy A. SULLIVAN,
Defendant.

No. 4-72 Cr. 211.

United States District Court,
D. Minnesota,
Fourth Division.

May 24, 1973.

Robert G. Renner, U. S. Atty., by John M. Lee, Asst. U. S. Atty., for plaintiff.

Jan D. Stuurmans, Minneapolis, Minn., for defendant.

NEVILLE, District Judge.

There is little controversy concerning the facts in this case. Defendant, who is charged with willfully and knowingly failing to submit to induction into the Armed Services in violation of 50 U.S.C. App. § 462, registered with the Selective Service System in August, 1970. In routine correspondence with his local Board in August, 1971, he indicated that he experienced chronic nosebleeds which he believed would exempt him from military service. When the defendant reported for his physical examination on December 10, 1971, pursuant to the order of his draft board, he reiterated his nosebleed condition and alleged he had other medical problems as well. He was thereafter told to report for further medical consultation on December 27, 1971 at which time Dr. John D. Banovetz examined the defendant. His report states:

"Tim Sullivan is being seen because of a tendency to get frequent nose bleeds. Examination of his nose shows the mucosa is somewhat reddened. There is no evidence of a nasal tumor. The nasopharynz is clear, larynx is normal. Our conclusion would be that the patient's nose bleeds come from dryness. The bleeding is

probably coming from the anterior end of the nasal septum. Patient has tried to use lubricants. This is not a serious problem but rather more of a nuisance problem regarding his nose. In my opinion it should not be a reason for not entering military service.

The patient was also seen for evaluation of his hearing. He has normal appearing eardrums. Rinne test is positive bilaterally. The patient was tested audiometrically. Although he was tested repeatedly he had no consistency. Our conclusion would be that he is consciously or unconsciously malingering. There was no test retest correlation. He could hear spoken voice rather well and we would feel that generally he had adequate hearing. *To completely evaluate his hearing he should be seen by an audiologist.* Mr. Sullivan does give a history of being exposed to a Rock Band. *Evaluation by an audiologist is suggested.*" [Emphasis added]

Notwithstanding Dr. Banovetz' recommendation, the defendant was not seen by an audiologist; and he received a Statement of Acceptability on or about February 9, 1972.

On or about March 16, 1972, the defendant received a Notice to Report for Induction on April 17, 1972, and a Current Information Questionnaire. He returned the Questionnaire, indicating thereon that he suffered from severe epistaxis (nosebleeds) and had a hearing loss. On April 7, 1972, the defendant wrote his Local Board and requested a Registrant Medical Reevaluation and Review. The defendant for the first time submitted corroborating letters from two doctors who had treated his nosebleed problem for many years. The letter from Dr. Everett C. Perlman dated March 6, 1972, states in full:

"This will certify that Timothy Sullivan has been a patient at this office since his birth. Beginning at age four years, and continuing to the present date, he had had frequent severe attacks of epistaxis, sometimes occur-

ring at the rate of four or five times weekly.

He had been seen in this office many times for this condition and has been seen and treated by nose and throat specialists, with countless cauterizations and other treatments. The attacks are not related to trauma.

It is believed that the chronic, recurrent aspect of this condition would make him unfit for military duty."

The other treating physician, Dr. Robert W. Wheeler, wrote on April 7, 1972:

"This patient has experienced recurring nose bleeds over the past 9 years. The bleeding site is on the nasal septum anteriorly, bilaterally. It has been cauterized on numerous occasions.

There are signs of recent bleeding present today also."

Defendant appeared and began his processing at the Induction Station (AFEES) on April 17, 1972. It is the defendant's uncontroverted testimony not rebutted by the government that the physical portion of the medical examination lasted only for several seconds and that Captain James W. Haight, M.D., the examining physician, provided the defendant with only a cursory several minute interview. Although Captain Haight had the complete medical record before him, the defendant's unchallenged testimony further indicated that the defendant's nose was not inspected and Captain Haight termed the nosebleeds a minor problem which the Army could handle. Similarly, the defendant's hearing was not reexamined, nor was the defendant ever provided with the audiologist which Dr. Banovetz recommended in January, 1972. After learning that he still was deemed fit for military service, the defendant left the induction station without any authorization, in effect, refusing induction. This prosecution followed.

The court recognizes that it has neither the expertise nor the authority to act as a *de facto* medical review board. The Eighth Circuit clearly indicated recently that the court's scope of inquiry

in this type of case is limited to the question of whether or not the Army followed its own regulations in conducting the physical examinations. The service's failure to abide by its own regulation, if such conduct prejudices the defendant, constitutes a defense to a criminal prosecution. United States v. Salisbury, 469 F.2d 826 (8th Cir. 1972).

The defendant alleges non-compliance with the applicable Army regulation in several material respects. He maintains that he was not properly examined at the Induction Station; that his physical condition was not discussed with him; and that he was not provided with the audiologist consultation recommended by Dr. Banovetz. The government argues that the examining physician was fully aware of the defendant's alleged problems and at all times acted in accordance with applicable regulations.

AR 601–270 § 4–21, which governs the scope of an Induction Station Physical, provides in pertinent part:

"b. Scope of physical inspection. The examining physician will review the previous medical examination reports (SF 88 and 89) and any accompanying additional documents, *and discuss with the examinee any intervening injuries and illnesses, or any other health problems not a matter of record.* The examinee, with clothing removed, *will be closely observed* by the examining physician to detect the presence of any communicable diseases and apparent defects not previously recorded. If additional defects are found, they will be recorded in accordance with paragraph 5–36." (Emphasis added)

Although the regulation could be narrowly interpreted to preclude the necessity of considering those injuries and illnesses which were recorded previously, the *Salisbury* opinion, *supra,* augurs against such a restrictive view. The Eighth Circuit specifically rejected the notion that the Induction Physical was limited to detecting the presence of defects not previously noted and stated at 829:

"We think the court's view of the physical inspection unduly limits its scope. Given the important interests of the army in detecting those physically unable to serve, see, United States v. Mendoza, 295 F.Supp. 673, 683 (E. D.N.Y.1969), and reading the regulation providing for physical inspection as a whole, we are convinced that the army intended to provide for a limited review of the evaluations of prior medical examinations as well as for the detection of changed or previously undetermined defects."

It is the court's view that the defendant's Induction Station physical did not conform with AR 601–270 § 4–21's requirement of a meaningful inspection of defects in light of the *Salisbury* decision. See United States v. Silver, 331 F.Supp. 415 (D.Minn.1971). The defendant submitted letters from two doctors who had treated his nosebleed condition for many years; yet the examining physician at the Induction Center failed to inspect the defendant's nose or to discuss the nosebleed problem. This case is not one in which the defendant went from doctor to doctor after he passed his initial pre-induction physical in an effort to manufacture a medical record. The two doctors' letters unequivocally indicate that the defendant's problem is one of longstanding and Dr. Perlman went so far as to suggest that the defendant was unfit for military service. In addition, the Army failed to arrange an appointment with the audiologist after Dr. Banovetz recommended such a course of action.

The court's inquiry is not ended by a determination that the Army did not follow its own regulations. *Salisbury, supra,* 469 F.2d at 828 requires the court also to determine whether the defendant demonstrates a "significant possibility that he might have been found unfit had he been given a full physical inspection." The court finds that Dr. Perlman's letter, which specifically states

the doctor's personal opinion that the defendant is unfit for military service, constitutes a sufficient basis for meeting the "significant possibility" test of Salisbury.[1] The court does not intend to opine on the question of whether the defendant is in fact or would be found fit for military service. The court does find, however, that the procedural requisites as judicially interpreted for an Induction Station physical, were not complied with and that the defendant therefore must be acquitted of the criminal charge.

A separate order has been entered.

1. The defendant's physical defect could potentially be disqualifying under any of the following sections:

AR 40–501 § 2–30. Deformities or conditions of the mouth . . . and nose which interfere with mastication and swallowing of ordinary food, with speech, or with breathing.

AR 40–501 § 2–35. Any other chronic skin disorder of a degree or nature which requires frequent outpatient treatment . . .

AR 40–501 § 2–39. Any deformity . . . which impairs general functional ability to such an extent as to prevent satisfactory performance of military duty.